IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MARY BENTZ, | ) | CASE NO.  1:20-CV-02136-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY | ) | JONATHAN D. GREENBERG |
| ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OF OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff, Mary Bentz ("Plaintiff" or "Bentz"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

In December 2013, Bentz filed an application for POD and DIB alleging a disability onset date of November 26, 2013 and claiming she was disabled due to polyarthralgia, hypocomplementemic urticarial vasculitis, depression, and high cholesterol.  (Transcript ("Tr.") at 11, 81, 92.)  The application was denied initially and upon reconsideration, and Bentz requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 11.)

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

On February 23, 2016, an ALJ held a hearing, during which Bentz, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On September 27, 2016, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 11-20.)  The ALJ's decision became final on August 29, 2017, when the Appeals Council declined further review.  (*Id.* at 1-5.)  Bentz challenged the ALJ's decision in this Court.  (*Id.* at 550.)  While that appeal was pending, Bentz refiled an application for disability benefits under Title II on September 12, 2017.  (*Id.*)  This Court remanded the ALJ's decision, the Appeals Council vacated the entire prior ALJ decision on remand, and consolidated the earlier and subsequent applications.  (*Id.*)

On October 18, 2019, an ALJ held a hearing, during which Bentz, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On November 14, 2019, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 550-581.)  The ALJ's decision became final on August 19, 2020, when the Appeals Council declined further review.  (*Id.* at 538-44.)

On September 22, 2020, Bentz filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 15, 17.)  Bentz asserts the following assignments of error:

(1) The ALJ failed to properly evaluate the opinion of Plaintiff's treating psychiatrist, Dr. Macknin.

(2) The ALJ's RFC fails to include an appropriate limitation for absenteeism.

(Doc. No. 1 at 16, 21.)

## II.      EVIDENCE

### A.      Personal and Vocational Evidence

Bentz was born in March 1965 and was 54 years-old at the time of her October 2019 administrative hearing (Tr. 550, 580), making her a "person closely approaching advanced age" under

2

Social Security regulations.  *See* 20 C.F.R. § 404.1563(d).  She has at least a high school education and is able to communicate in English.  (Tr. 580.)  She has past relevant work as a cashier and medical admittance clerk.  (*Id.*)

## B.    Relevant Medical Evidence[2]

On June 6, 2013, Bentz saw Qingping Yao, M.D., for follow up.  (*Id.* at 317.)  Dr. Yao noted a 90% improvement in Bentz's rash, although Plaquenil had to be stopped in April 2013 because of suicidal ideation.  (*Id.*)  Bentz reported being happy since then.  (*Id.*)  On examination, Dr. Yao found no unsteady gait, no cane use, tenderness over the right upper quadrant, and normal range of motion of the spine and extremities.  (*Id.* at 318.)

On December 12, 2013, Bentz saw Dr. Yao for follow up.  (*Id.* at 324.)  Dr. Yao noted an 85% improvement in Bentz's rash and no suicidal ideation after stopping Plaquenil.  (*Id.*)

On May 30, 2014, Bentz was admitted to Lutheran Hospital with suicidal and homicidal ideation.  (*Id.* at 517-18.)  Bentz reported depressed mood, feeling helpless and hopeless, disturbed sleep and appetite, days where she would stay up for one to two weeks getting three hours of sleep and where her mind races.  (*Id.*)  On examination, Bentz behaved appropriately and demonstrated normal speech, depressed mood, coherent thought form and content, suicidal and homicidal ideation, absent insight, grossly impaired judgment, intact memory, and normal psychomotor activity.  (*Id.* at 520.)  Later that night, while Bentz's mood was sad and her affect reactive, her thoughts were organized and goal-oriented and she denied suicidal and homicidal ideation.  (*Id.* at 522.)  On June 2, 2014, treatment providers noted Bentz was "[f]eeling good" and she "denie[d] the feelings that led to hospitalization."  (*Id.* at 526.)  Bentz reported her pain was better in the hospital.  (*Id.*)  On examination, Bentz behaved appropriately and

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  As Bentz challenges only the ALJ's mental findings, the Court further limits its discussion of the evidence to Bentz's mental impairments.

demonstrated normal speech, appropriate and hopeful mood/affect, coherent thought form and content, no suicidal or homicidal ideation, appropriate insight and judgment, intact memory, and normal psychomotor activity.  (*Id.* at 526-27.)  On June 3, 2014, at discharge, Bentz was well dressed and well groomed, she behaved appropriately and demonstrated normal speech, an appropriate, bright, and hopeful mood/affect, coherent thought form and content, no suicidal or homicidal ideation, appropriate insight and judgment, intact memory, and normal psychomotor activity.  (*Id.* at 530.)

On June 30, 2014, Bentz underwent a psychiatric evaluation at the Centers for Families and Children upon referral by Lutheran Hospital.  (*Id.* at 381.)  Bentz reported suicidal thoughts twice a week for the past year.  (*Id.*)  Bentz further reported struggling with anxiety for the past six months.  (*Id.*)  On examination, treatment providers found Bentz moderately anxious with severe restless leg, full affect, and coherent, linear, and goal-oriented thought process.  (*Id.* at 383.)  Bentz smiled often and denied hopelessness and suicidal or homicidal ideation.  (*Id.*)  Treatment providers diagnosed Bentz with major depressive disorder, single episode, unspecified, and anxiety disorder, not otherwise specified.  (*Id.*)  Treatment providers continued Bentz's Wellbutrin and started her on Zoloft.  (*Id.*)

Bentz saw Mariah Bruening, LPCC/S, and other treatment providers at the Centers for Families and Children through 2014 and 2015 for her depression and anxiety.  (*Id.* at 391-438, 446-483.)

On January 19, 2016, Bruening, Bentz's therapist at the Centers for Families and Children, completed a mental residual functional capacity assessment.  (*Id.* at 374-75.)  Bruening opined Bentz had a rare ability to: maintain attention and concentration; respond appropriately to changes in routine settings; maintain regular attendance and be punctual; deal with the public, co-workers, and supervisors; function independently without redirection; work in coordination with or proximity to others without being distracted or distracting; deal with work stress; complete a normal work day and work week; understand, remember, and carry out even simple job instructions; socialize; behave in an emotionally stable manner;

4

and leave home on her own.  (*Id.* at 374-75.)  Bruening based her opinions on Bentz's major depression, severe and generalized anxiety disorder, which included severe anxiety and panic when leaving the home. (*Id.* at 375.)

On January 26, 2016, Dr. Carol Macknin, Bentz's psychiatrist, co-signed Bruening's opinion after seeing Bentz for the first time that day.  (*Id.* at 375, 484.)  During her January 26, 2016 visit with Dr. Macknin, Bentz reported no suicidal ideation, going to the store with another family member so she did not get a panic attack, and sleeping four hours a night.  (*Id.* at 484.)  Bentz told Dr. Macknin she often slept or read "'to escape.'"  (*Id.*)  Dr. Macknin noted Bentz needed a mood stabilizer as she had "much fluctuation in mood" and was "very reactive to her environment."  (*Id.* at 485.)  Dr. Macknin diagnosed Bentz with bipolar affective disorder, depressed panic disorder with agoraphobia, impulse control disorder, and borderline personality disorder.  (*Id.*)

On April 5, 2016, Bentz saw Dr. Macknin for follow up regarding her bipolar affective disorder and depression.  (*Id.* at 1144.)  Bentz reported "variable" depression and that she was doing well that day. (*Id.*)  Bentz denied panic attacks and reported she spent her days "'being the maid at home.'"  (*Id.*)  Bentz told Dr. Macknin she had intermittent suicidal ideation when she felt worthless at times.  (*Id.*)  Dr. Macknin adjusted Bentz's medication.  (*Id.* at 1145.)

On May 31, 2016, Bentz saw Bruening for follow up.  (*Id.* at 1098.)  Bentz and Bruening discussed Bentz's difficulty in adjusting to not taking sleep medication anymore.  (*Id.*)  Bentz reported being very inactive during the day, binge watching TV shows, sleeping, and spending a lot of time in her bedroom in the basement.  (*Id.*)  Bentz told Bruening she was open to making changes in how she structured her day but Bentz felt her depression dictated much of what she chose to do that day.  (*Id.*)  Bentz agreed to go outside four days that week in the morning and to limit her daily naps.  (*Id.*)

On June 7, 2016, Bentz saw Bruening for follow up.  (*Id.* at 1097.)  Bentz reported she had gone outside three days that week.  (*Id.*)  Bentz agreed to try and increase the days outside to five and sit on the porch with her coffee.  (*Id.*)  Bruening noted Bentz "demonstrated improvement in feeling more empowered to express expectations to her daughter."  (*Id.*)

On June 14, 2016, Bentz saw Dr. Macknin for follow up.  (*Id.* at 1148.)  Bentz reported good days and bad days; some days she did not get out of bed until 11:00 a.m., felt unmotivated, and then did not do anything.  (*Id.*)  Bentz told Dr. Macknin that happened three out of the past seven days.  (*Id.*)  Other days, she may get up and work in the yard all day.  (*Id.*)  Bentz reported this happened four out of the past seven days.  (*Id.*)  Bentz also told Dr. Macknin she had been picking at her skin and hair.  (*Id.*)

On October 4, 2016, Bentz went to the emergency room with complaints of depression and suicidal ideation.  (*Id.* at 998.)  Bentz denied homicidal ideation and reported she was compliant with her medications.  (*Id.*)  She requested a psychiatric admission.  (*Id.*)  On examination, treatment providers found normal speech, normal behavior, depressed and anxious mood, and normal cognition and memory.  (*Id.* at 1000.)  Bentz reported impulsivity, suicidal ideation, and suicidal plans.  (*Id.*)  Treatment providers admitted Bentz.  (*Id.* at 1001.)  Bentz's toxicology screen was positive for amphetamines, but one of her medications could cause a false positive.  (*Id.* at 1008.)  Treatment providers noted Bentz stabilized on the unit and "[s]howed quick improvement in her mood and outlook."  (*Id.* at 1019.)  At discharge on October 7, 2016, Bentz was well-dressed and well-groomed and demonstrated normal speech, appropriate, bright, happy, and hopeful mood/affect, coherent thought form and content, appropriate insight and judgment, intact memory/cognition, and normal psychomotor activity.  (*Id.* at 1019-20.)  Bentz's diagnoses consisted of mood disorders, bipolar disorder II, and borderline personality traits.  (*Id.* at 1020.)

On December 6, 2016, Bentz arrived at the emergency room stating she attempted suicide by taking eight Klonipin tablets one to two hours before arrival.  (*Id.* at 1023.)  Bentz had taken the bus to the

emergency room.  (*Id.*)  Bentz reported feeling tired.  (*Id.*)  On examination, treatment providers found inappropriate affect.  (*Id.* at 1025.)  Bentz appeared tired but was easily aroused.  (*Id.*)  Treatment notes reflect that given the low amount of Klonipin Bentz had taken based on her weight that acute benzodiazepine toxicity was unlikely and Bentz was cleared to be evaluated by psychiatry.  (*Id.* at 1027.) Treatment providers admitted Bentz after a psychological evaluation where Bentz reported stress of not being able to care for her high school daughter, poor sleep and poor appetite, auditory hallucinations, and ineffective medications.  (*Id.* at 1027, 1029.)  Treatment providers noted Bentz was calm and cooperative. (*Id.* at 1029.)  In a discharge summary on December 9, 2016, treatment providers noted Bentz assumed the primary caregiver role at home and was responsible for cooking and cleaning, but there was no appreciation of her work which made her feel overwhelmed.  (*Id.* at 1049.)  Bentz tolerated her medication well and was sleeping and eating well.  (*Id.*)  On examination at discharge, Bentz was casually dressed and demonstrated appropriate behavior, normal speech, appropriate mood/affect, coherent thought form and content, appropriate judgment, intact memory/cognition, and normal psychomotor activity.  (*Id.* at 1049-50.)  Bentz's diagnoses included mood disorder, bipolar disorder II, major depressive disorder with psychotic features, generalized anxiety disorder, and borderline personality disorder.  (*Id.* at 1050.)

On February 8, 2017, Bentz saw Melissa Gintert, QMHS, and reported difficulty sleeping and concerns regarding her daughter moving out and going to college.  (*Id.* at 1102.)  Bentz told Gintert she had been doing okay but had felt "kind of 'low'" over the past few days and was having racing thoughts and trouble sleeping.  (*Id.*)  Bentz reported she was hopeful sometimes and stressed at other times.  (*Id.*) Gintert noted Bentz had made progress in her treatment.  (*Id.*)

On March 1, 2017, Bentz saw Gintert for follow up and reported feeling depressed the past three days and sleeping more than usual.  (*Id.* at 1104.)  Bentz told Gintert her depression stemmed from an incident with her boyfriend and her daughter getting ready to leave for college.  (*Id.*)  Bentz complained

that her medication did not seem to be helping her depression but acknowledged there was a trial-and-error process with medication.  (*Id.*)  Bentz reported not liking people.  (*Id.*)  Gintert noted Bentz had made progress in her treatment.  (*Id.*)

On April 12, 2017, Bentz saw Dr. Macknin for follow up.  (*Id.* at 1163.)  Bentz reported having good days and bad days and told Dr. Macknin she would do anything to get rid of her depression.  (*Id.*)  Bentz told Dr. Macknin she had felt suicidal twice in the past month and when she felt that way, she made sure she was around people.  (*Id.*)  Dr. Macknin noted Bentz had made some progress in her treatment and would call Lutheran Hospital to inquire about the possibility of electroconvulsive therapy.  (*Id.* at 1164.)

That same day, Bentz saw Gintert for follow up.  (*Id.* at 1110.)  Gintert encouraged Bentz to research ECT and ask questions regarding her concerns about ECT.  (*Id.*)

On June 25, 2017, Bentz went to the emergency room for suicidal ideation with a plan to overdose on her medications.  (*Id.* at 1064.)  Bentz wanted to be admitted and have her medications adjusted.  (*Id.* at 1066.)  On examination, Bentz was well-groomed and cooperative and had a blunted affect.  (*Id.* at 1067.)  The next day, Bentz denied suicidal ideation and asked to be discharged home.  (*Id.* at 1064.)  Treatment providers discharged Bentz and recommended she follow up with her outpatient provider.  (*Id.*)

On July 2, 2017, Bentz reported to the emergency room with suicidal ideation.  (*Id.* at 969.)  Bentz denied neck and back pain, demonstrated clear speech, and moved all extremities.  (*Id.* at 970.)  She had full range of motion and a normal gait.  (*Id.* at 971.)  Bentz reported coming to the hospital because she was tired and no one cared about her.  (*Id.* 977.)  Bentz told treatment providers she had taken both her night-time pills and day-time pills "in the hope that it would help with her to straighten her life out."  (*Id.*)  On examination, Bentz demonstrated normal speech, constricted affect, dysphoric mood, and normal thought form and content.  (*Id.*)  Treatment providers admitted Bentz for psychiatric treatment.  (*Id.* at 978.)  A discharge summary dated July 5, 2017, noted "much improvement" in Bentz's affect and thought

8

process and Bentz was more easily redirected than before.  (*Id.* at 979.)  Bentz demonstrated "substantial[]" improvement and was stable enough to be discharged.  (*Id.*)  On examination at discharge, Bentz demonstrated soft and slow speech, better mood and affect, fair attention and focus, linear, goal-directed thought form, intact association, normal thought process, and improving judgment and insight. (*Id.*)

On September 27, 2017, Bentz saw Bruening for follow up and reported three hospitalizations in the past year for suicidal ideation.  (*Id.* at 1093.)  Bruening noted Bentz was still her mother's primary caretaker.  (*Id.*)  Bentz told Bruening her hospitalizations had increased over the past year because she was "overwhelmed with her life situation."  (*Id.* at 1094.)  Bentz reported, "'I get to the point where I just can't take it anymore.  So I go and stay for 3 days.'"  (*Id.*)

On November 14, 2017, Gintert and Dr. Macknin completed a Medical Source Statement – Mental Capacity form.  (*Id.* at 1175-76.)  Gintert and Dr. Macknin opined Bentz had marked limitations in her abilities to understand, remember, and apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage herself.  (*Id.*)  Gintert and Dr. Macknin based their opinions on Bentz's "ongoing depression, recurrent, with intermittent suicidal ideation, panic disorder with agoraphobia, impulse control D/O, [and] borderline personality disorder," all of which "affect [Bentz's] ability to function."  (*Id.* at 1176.)

On October 11, 2017, Bentz saw Gintert for follow up and reported difficulty sleeping again.  (*Id.* at 1126.)  Gintert noted Bentz had made minimal progress in her treatment.  (*Id.*)

On December 20, 2017, Bentz saw Gintert for follow up.  (*Id.* at 1179.)  Bentz reported improvement in her mental health symptoms as a result of increased compliance with medication, although she was having increased depression and anxiety because of the upcoming holidays.  (*Id.* at 1180.)  Gintert noted Bentz had made progress in her treatment.  (*Id.*)

On October 10, 2018, Bentz went to the emergency room after being sent in by her psychiatrist for suicidal thoughts.  (*Id.* at 1364.)  Bentz reported feeling increasingly depressed over the past week and was unsure why.  (*Id.*)  Bentz said she had thought about getting a gun from her boyfriend's house and shooting herself.  (*Id.*)  Bentz also reported auditory hallucinations of a ghost talking in her kitchen.  (*Id.* at 1369.)  On examination, treatment providers found normal mood and affect, normal speech and behavior, suicidal ideation and plan, and no homicidal ideation.  (*Id.* at 1366.)  Treatment providers admitted Bentz to psychiatry.  (*Id.* at 1367.)  Treatment providers discharged Bentz on October 16, 2018 in stable condition.  (*Id.* at 1376.)

**C.    State Agency Reports**

On December 4, 2017, Patricia Kirwin, Ph.D., opined that Bentz had moderate limitations in her abilities to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage herself.  (*Id.* at 645-46.)  Dr. Kirwin further opined Bentz retained "the ability to understand and remember 1-4 step tasks consistently and 5-6 step tasks occasionally" and that Bentz was "capable of maintaining attention and concentration for 1-4 step tasks consistently and 5-6 step tasks occasionally."  (*Id.* at 651.)  Bentz could "interact briefly and occasionally in situations that do not require more than superficial contact with coworkers, supervisors, and the general public."  (*Id.*)  Bentz "retain[ed] the ability to complete tasks in an environment in which changes are occasional and explained in advance."  (*Id.*)

On February 9, 2018, on reconsideration, Cynthia Waggoner, PsyD., affirmed Dr. Kirwin's findings.  (*Id.* at 661-62, 666-68.)

**D.    Hearing Testimony**

During the October 18, 2019 hearing, Bentz testified to the following:

- She lives with her daughter who was turning 21 soon.  (*Id.* at 601.)  Her daughter worked full time.  (*Id.*)  They both received food stamps.  (*Id.*)  She had a driver's

10

license but no access to a car. (*Id.*) Bentz avoided taking the bus and used Uber "a lot." (*Id.* at 602.) She last took the bus four months ago to go to the doctor. (*Id.*)

- Her mental health was unstable and prevented her from working. (*Id.* at 604.) She was suicidal and homicidal. (*Id.*) During the relevant timeframe, she was hospitalized for her ideations. (*Id.*) She could not recall how many times. (*Id.*) She was hospitalized more than once a year. (*Id.*) Sometimes during the relevant timeframe, she was only hospitalized once a year. (*Id.*) She was also "extremely depressed" and could not concentrate on anything. (*Id.*) She was receiving counseling and taking medication for her mental conditions during that time. (*Id.* at 605.) She did not see any improvement with treatment. (*Id.*) Her pain in her legs and back also prevented her from working. (*Id.* at 607.)

- Currently, there has not been any improvement and she is still going through counseling and taking medication for her mental conditions. (*Id.* at 606.) Treatment was not helping. (*Id.*) She had suicidal ideations the weekend before the hearing. (*Id.*) The most recent time before that may have been last year. (*Id.* at 607.)

- On a typical day, she gets up and takes her medication. (*Id.*) If her daughter has left for work, she does the dishes for a little while because she cannot stand for very long. (*Id.*) She then watches TV for a while, finishes the dishes, and then watches TV again. (*Id.*) If her back is feeling a little better, she will vacuum one room. (*Id.*) She then will play on her computer or her phone. (*Id.*) During the relevant timeframe, she spent her days the same way. (*Id.* at 607-08.) Her friends come over once every four months. (*Id.* at 608.) She reads as a hobby, but she does not remember what she reads. (*Id.* at 608-09.) She did not read as much during the relevant timeframe. (*Id.* at 609.)

- There has been no change in her mental condition since her last hearing. (*Id.*)

- During the relevant timeframe, Bentz's bipolar symptoms included depression and then manic phases. (*Id.* at 611.) During her depressive phases she could not get out of bed, and during her manic phases she was up for days and very promiscuous. (*Id.*) Her depressive phases lasted for two weeks to a month. (*Id.* at 612.) Sometimes there were periods of stability in between the manic and depressive phases. (*Id.*) She was a caretaker for her mother. (*Id.*) She would make her mother's meals. (*Id.*) She occasionally changed her mother's diapers. (*Id.* at 613.) She would make sure her mother had her doctor's appointments and was taking her medication. (*Id.* at 615.) She would make sure her mother got her medication from the pharmacy and took her to her doctor's appointments. (*Id.*) She had a hard time handling her symptoms and taking care of her mother. (*Id.* at 613.) Her daughter would need to take care of her mother and get her meals. (*Id.*) By the end of 2017, her mother was feeling better and taking care of herself more. (*Id.* at 616.)

- She gets anxiety attacks when she takes the bus or leave the house. (*Id.* at 613.) That was true during the relevant timeframe as well. (*Id.*)

11

The ALJ instructed the VE that the ALJ was going to use the past work finding from the prior determination.  (*Id.* at 619.)  The ALJ then posed the following hypothetical question:

> Assume a hypothetical individual of the claimant's age and education and with the past jobs that we discussed.  Further assume that this individual is limited as follows.
>
> This is a light exertional hypothetical with the following additional limitations.  This person can operate hand controls frequently with the right hand and can frequently reach overhead with the right upper extremity.  This person can frequently climb ramps and stairs, never ladders, ropes or scaffolds, frequently stoop and only occasionally kneel, crouch and crawl.
>
> This person can never work at unprotected heights or near dangerous moving machinery.  And this person is limited to performing simple routine tasks with no strict production-rate pace requirements.  Can tolerate only occasional interactions with supervisors, coworkers and the public, and can o=tolerate only occasional routine workplace changes, where any changes outside of the routine need to be explained in advance.
>
> Can this hypothetical person perform any of the past jobs that Ms. Bentz performed?

(*Id.*)

The VE testified the hypothetical individual would not be able to perform Bentz's past work.  (*Id.*)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as housekeeper, food service worker, and mail clerk.  (*Id.* at 620.)

The ALJ then posed a second hypothetical:

> Okay, for the next hypothetical, Mr. Salkin, this is a light exertional hypothetical with the following additional limitations.  This person can only stand and walk for four hours in an eight-hour workday, can handle and finger frequently with the right hand.  Can only occasionally climb ramps and stairs but never ladders, ropes or scaffolds.  Can frequently balance and only occasionally stoop, kneel, crouch and crawl.  And this person can never work at unprotected heights or near dangerous moving machinery.
>
> Additionally, this person – one second, please.  This person is again limited to performing simple routine tasks with no strict production-rate pace requirements.  Can tolerate occasional interaction with supervisors, coworkers and the public, and can tolerate occasional routine workplace changes where changes outside of the routine are explained in advance.

12

(*Id.* at 621.)

The VE testified past work was still unavailable. (*Id.*) The VE testified no work would be available for such a hypothetical individual, as the combination of four hours standing and walking and occasional social contact would "markedly erode the unskilled light and sedentary job base." (*Id.*)

In response to the ALJ's question regarding an employer's tolerance for absences, the VE testified that a person could be absent no more than once a month to sustain competitive employment. (*Id.* at 622.) Bentz's counsel asked the VE how an employer would tolerate an individual who would have no absences for two or three months but then missed five days in one month, again had two or three months with no absences, and then again missed three or four days a month. (*Id.*) The VE testified as follows: "Well. I think the no more than once a month absence is an average, which is the best we can do. I think an individual that has sporadic gaps in showing up is going to exceed the average of once a month and not going to be able to retain employment." (*Id.* at 623.)

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, and 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th

13

Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 404.1520(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience.  *See* 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. § 404.1520(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Bentz was insured on her alleged disability onset date, November 26, 2013, and remained insured through December 31, 2017, her date last insured ("DLI").  (Tr. 550-51.)  Therefore, in order to be entitled to POD and DIB, Bentz must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2017.

14

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of November 26, 2013 through her date last insured of December 31, 2017 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: polyarthralgia related to degenerative joint disease of the left knee, hips, and right shoulder, and degenerative disc disease of the spine; hypocomplementemic urticarial vasculitis; obesity; depressive disorder, anxiety disorder; borderline personality disorder; attention deficit disorder; and substance addiction disorders (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except operate hand controls frequently with the right hand; frequently reach overhead with the right upper extremity; frequently climb ramps or stairs; never climb ladders, ropes, and scaffolds; frequently stoop; occasionally kneel, crouch, and crawl; never work at unprotected heights or near dangerous moving machinery; simple, routine tasks, with no strict production rate pace requirements; can tolerate only occasional interactions with supervisors, coworkers, and the public; and can tolerate only occasional routine workplace changes, where any changes in the routine are explained in advance.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on March **, 1965 and was 52 years old, which is defined as an individual closely approaching advanced age, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.    The claimant was not under a disability, as defined in the Social Security Act, at any time from November 26, 2013, the alleged onset date, through December 31, 2017, the date last insured (20 CFR 404.1520(g))

(Tr. 553-581.)

## V.    STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because

16

there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.    Treating Psychiatrist's Opinion

In her first assignment of error, Bentz asserts the ALJ "selectively focused on only positive psychiatric findings, largely to the exclusion of evidence of significantly debilitating limitations."  (Doc. No. 15 at 16.)  In addition, Bentz argues while the ALJ considered Dr. Macknin's opinion, the ALJ did

"not clearly state whether he accepted the doctor as a treating physician – even though he noted that a treating source opinion had been provided by Mariah Bruening, ATR, PCC-S *and* Dr. Macknin." (*Id.*) (emphasis in original) (citation omitted).  Bentz maintains Dr. Macknin should have been recognized as a treating physician and her opinion should have been given controlling weight. (*Id.* at 17.)  Finally, Bentz argues the ALJ failed to give good reasons for the weight given to Dr. Macknin's opinion, as the only reason given was inconsistency with the record evidence "*and the weighted portions* of the medical opinions of record." (*Id.* at 18) (emphasis in original).  While Bentz recognizes the ALJ cited to a "series of pieces of evidence" in support, Bentz argues the ALJ's reliance on Bentz's "limited activities" did not mean she could "endure in th[e] workplace." (*Id.*)

The Commissioner argues the ALJ "reasonably gave little weight" to Dr. Macknin's opinions. (Doc. No. 17 at 9.)  The Commissioner asserts substantial evidence supports the ALJ's decision to discount Dr. Macknin's opinions because they were inconsistent with the objective evidence in the record. (*Id.*)  The Commissioner maintains that, contrary to Bentz's assertion, the ALJ recognized Dr. Macknin as a treating psychiatrist. (*Id.* at 10.)  In addition, the ALJ acknowledged contrary evidence in the record, including Bentz's hospitalizations, and the Court may not reweigh the evidence on judicial review. (*Id.*)

As the Sixth Circuit has explained, "'[t]he Commissioner has elected to impose certain standards on the treatment of medical source evidence.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).  Medical opinions are to be weighed by the process set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c),[3] and "[t]he source of the opinion . . . dictates the process by which the Commissioner accords it weight." *Id.*  "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source'), *id*. § 404.1502, 404.1527(c)(1), and an opinion

---

[3] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), *id.* § 404.1502, 404.1527(c)(2)." *Id.*  In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker."  Social Security Ruling ("SSR") 96–6p, 1996 WL 374180 at *2 (Soc. Sec. Admin. July 2, 1996).[4]

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Gayheart,* 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399 (6th Cir. 2009) (quoting SSR 96-2p, 1996 WL 374188, at *4 (SSA July 2, 1996)).[5]  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[6]  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as

---

[4] SSR 96-6p was rescinded and replaced by SSR 17-2p, effective March 27, 2017.  *See* SSA 17-2p, 2017 WL 3928306, at *1 (SSA Mar. 27, 2017).

[5] SSR 96-2p has been rescinded.  This rescission is effective for claims filed on or after March 27, 2017. *See* SSR 96-2p, 2017 WL 3928298, at *1.

[6] Pursuant to 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting SSR 96-2p, 1996 WL 374188, at *5). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.[7]

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not

---

[7] "On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. 20 C.F.R. §§ 404.1527(c), 416.927(c). Other factors 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion. *Id.* § 404.1527(c)(6)." *Gayheart*, 710 F.3d at 376.

bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them.  *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs*., 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."  *Id*.  It is the Commissioner who must make the final decision on the ultimate issue of disability.  *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n.1 (11th Cir. 1982).

The ALJ weighed and analyzed Dr. Macknin's opinions as follows:

> The undersigned gives little weight to the treating source opinions of Mariah Bruening, ATR, PCC-S, and Carol Macknin, M.D. (5F). They opined collectively that the claimant is generally unable to sustain attention and concentration, tolerate stress, interact appropriately with others, and complete a normal workday or workweek. The criteria for evaluating medical opinions are set forth in 20 CFR 404.1527. These sections state, among other things, that generally more weight is given to the opinions of treating sources because they are likely to be most able to provide a detailed, longitudinal picture of the claimant's impairments. However, if it is found that a treating source's medical opinion on the issue of the nature and severity of the claimant's impairments is not well supported by medically acceptable clinical and laboratory diagnostic techniques and is inconsistent with other evidence of record, it will not be given controlling weight. The undersigned applied this analysis to all of the claimant's treating, acceptable medical source opinions, including that of Dr. Macknin. As to medical source opinions of non-acceptable medical sources, including that of Ms. Bruening, physical therapists, and Ms. Gintert (as discussed below), the undersigned not [sic] evaluate their opinions for controlling weight, but rather, the undersigned evaluated these opinions as evidence from a source other than an acceptable medical source, pursuant to 20 CFR 404.1527(f). The undersigned evaluated this opinion under the factors set forth in 20 CFR 404.1527(c).
>
> After considering these opinions and the evidence, the undersigned gives little weight to these opinions because they are inconsistent with the evidence of record, including the claimant's reported functioning, exam findings, and the

weighted portions of the medical opinions of record. The claimant's reported daily functioning does not support a marked, serious, or worse degree of limitation in adapting or managing herself. For example, the claimant also reported that she is able to prepare simple meals for her household, which include her mother, brother, and daughter; and she is able to go grocery shopping with her sister (Testimony); she cooks two to three times a week; she cleans two to three times per week; she does laundry weekly; she shops once a week; she showers and bathes multiple times per week; she dresses daily; she watches television; she reads; she socializes with friends (3F/4); she has a high school diploma; she has some college, including a certificate in medical assisting; she spends about one hour per day reading (Testimony); she is able to perform laundry and mowing; she is able to use public transportation; she is able to shop for food in stores monthly; she is able to count change (22E/5-6); she is able to pay bills, count change, handle a savings account, and use a checkbook/money order; and she spends time with others by talking on the phone "once a day" (23E/4-5). This reported functioning does not evidence marked, serious, or worse limitations in adapting or managing herself.

The claimant's mental status examination findings do not support more than a fair or moderate degree of limitation in any areas of mental functioning. At exam on June 30, 2014, she presented as anxious though with full affect and frequent smiling (6F/8). At exam on January 27, 2015, the claimant was fully oriented; her affect was full range; she was friendly and conversational; she did not appear depressed; her thought processes were clear, coherent, linear, and logical; and no symptoms of psychosis were evidence or reported. (6F/87). At exam on May 19, 2016, her mood and affect were normal. (10F/16). At exam on April 26, 2017, her mood, affect, and behavior were normal. (12F/77). Her exam was substantially similar on June 13, 2017. (10F/81). At exam on intake of one of her episodes of suicidal ideation on July 2, 2017, she had fair grooming and hygiene; her speech, thought form, and thought content were within normal limits; her affect was constricted; and her mood was dysphoric. (9F/10). At discharged on July 5, 2017, her memory, orientation, attention, fund of knowledge, were fair; and her insight and judgment were improving. (9F/12). At exam on July 7, 2017, she had a normal affect, mood, and behavior. (10F/98). At exam on October 18, 2018, she her mood and affect were normal; and she was fully oriented. (27F/8). While these examinations show some degree of impairment, they do not show a marked, serious, or worse degree of difficulty in any areas of functioning.

Despite the relatively stressful nature of the hearing, the claimant did not appear to have a marked, significant, serious or worse degree of limitation understanding, remembering, concentrating on, persisting with, or adapting to the stresses involved in interacting and responding to questions asked by counsel or the undersigned. (Hearing Observation). After reviewing the medical evidence of record available to them, including some of the aforementioned mental status examination findings, the state agency

psychological consultants opined that the claimant has no worse than a "moderate" degree of limitation in any areas of mental functioning. (See 6A/7; 8A/7). These exam findings, reported functioning, observations, and weighted portions of the medical opinions do not support the degree of limitation found by Mr. Bruening or Dr. Macknin. Moreover, Dr. Macknin's own treatment notes do not evince such limitations.

Dr. Macknin's own exam findings do not support a marked, significant, or worse degree of limitation in any areas of functioning. For example, at exam on November 20, 2018, the claimant's overall appearance was appropriate; she was cooperative; her motor activity was calm; her speech was unremarkable; her thought content and thought processes were unremarkable; her eye contact was good; she was fully oriented; her insight and judgment were appropriate; her memory was grossly intact; and her intellect was average. (22F/7). At exam on January 2, 2019, her affect was slightly constricted, and she was otherwise unremarkable throughout, which was substantially similar to her prior exam. (23F/7). The claimant reported good medical adherence and no side effects. (23F/7). At exam on February 13, 2019, her mental status exam was similarly unremarkable. (26F/3). At exam on June 12, 2019, her affect was restricted and she had "depressive cognitions"; however, she was otherwise unremarkable throughout. (29F/12). Lastly, it is important to note that after reviewing the medical evidence of record available to them, including some of the aforementioned mental status examination findings, the state agency psychological consultants opined that the claimant has no worse than a "moderate" degree of limitation in any areas of mental functioning. (See 6A/7; 8A/7). Dr. Macknin and counselor Bruening's opinion are consistent with the evidence of record. For these reasons, and based on this evidence, the undersigned gives little weight to these opinions.

For the same reasons noted above, the undersigned gives little weight to the collective opinions of treating psychiatrist, Carol Macknin, M.D., and therapist Melissa Gintert, dated November 14, 2017. (12F/1-2). They opined that the claimant has, predominantly, marked limitations in all areas of mental functioning related to her mental impairments. Similarly, the undersigned gives little weight to the opinion of Dr. Macknin dated August 1, 2018. (17F/1-2). She made similar findings as noted on that form. The undersigned reincorporates the recitation of the claimant's reported functioning, examination findings, observations, and weighted portions of the other medical opinions of record, as if fully restated herein. This evidence does not support a marked, serious, significant, or worse degree of limitation in any areas of mental functioning, as found by Dr. Macknin and Ms. Gintert in their opinion.

(Tr. 577-79.)

First, as the Commissioner correctly points out, the ALJ explicitly recognized Dr. Macknin as a treating source.[8]  (*Id.*)  *Cf. Johnson v. Comm'r of Soc. Sec.*, Case No. 1:20cv156, 2021 WL 1214795, at *1 (N.D. Ohio Mar. 31, 2021) (ALJ identified treating source as state agency consultant and did not credit the treating source's assessment of the claimant's mental health).

Second, the ALJ did not simply rely on Bentz's daily activities and the opinions of the state agency reviewing sources in assigning Dr. Macknin's opinions little weight.  *Cf. Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 321-27 (6th Cir. 2015); *Johnson*, 2021 WL 1214795, at **5-6.  Rather, the ALJ found Dr. Macknin's opinions inconsistent with her own treatment notes.  (Tr. 577-79.)

Third, the ALJ discussed findings that both supported and undercut a finding of disability in the RFC analysis, including recognizing Bentz's hospitalizations and suicide attempts.  (*Id.* at 565-79.) Therefore, the Court rejects Bentz's assertion that the ALJ cherry-picked the record.

The ALJ considered and weighed the medical opinion evidence of record and provided an explanation for the weight assigned.  The ALJ determined that Dr. Macknin's opinions were inconsistent with Bentz's reported functioning, Dr. Macknin's own treatment notes, and other objective evidence in the

---

[8] Although the ALJ recognized Dr. Macknin as a "treating source," the Court has some doubt as to whether she qualified as such for purposes of her 2016 opinion under Social Security regulations.  A treating source must have "an ongoing treatment relationship with" the claimant, and the frequency of treatment must be "consistent with accepted medical practice" for the claimant's condition.  20 C.F.R. § 404.1502.  *See Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 273 (6th Cir. July 13, 2015).  Precedent in this Circuit suggests a physician who treats an individual only twice or three times does not constitute a treating source.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506–07 (6th Cir. 2006) ("Depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship"); *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 629 (6th Cir. 2016); *Mireles ex rel. S.M.M. v. Comm'r of Soc. Sec.*, 608 F. App'x 397, 398 (6th Cir. 2015); *Helm v. Comm'r of Soc. Sec. Admin.*, 405 F. App'x 997, 1000–01 n. 3 (6th Cir. 2011.)  *See also Fleischer*, 774 F. Supp. 2d 875, 879 (N.D. Ohio 2011); *Pethers v. Comm'r of Soc. Sec.*, 580 F. Supp. 2d 572, 579 n .16 (W.D. Mich.2008); *Carter v. Berryhill*, 2017 WL 2544064, at * 9 (N.D. Ohio May 26, 2017); *Witnik v. Colvin*, 2015 WL 691329, at * 7 (N.D. Ohio Feb. 18, 2015).  Here, the record reflects Dr. Macknin treated Bentz only one time before co-signing the January 2016 opinion with Bruening.  (Tr. 484.)  Thus, it is questionable whether she qualified as a "treating source" at the time she authored her January 2016 opinion.

24

record, citing specific examples. (*Id.* at 577-79.) Furthermore, the ALJ's RFC was generally consistent with the state agency reviewing sources' opinions,[9] whose opinions post-dated Dr. Macknin's 2016 and 2017 opinions and who had the benefit of reviewing some of Dr. Macknin's treatment notes. (*Id.* at 645-46, 650-52, 661-62, 666-68.) It is the ALJ's duty, not this Court's, to weigh the evidence and resolve any conflicts, and he did so here.

Although Bentz cites evidence from the record she believes supports a more restrictive RFC, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001). Indeed, the Sixth Circuit has made clear that an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

There is no error in the ALJ's evaluation of Dr. Macknin's opinions.

**B.    RFC Findings**

Bentz argues that because the record demonstrated she had been at the emergency room or hospitalized for 13 days between October 2016 and July 2017, the ALJ should have included a limitation in the RFC "accounting for the regular absenteeism" caused by Bentz's mental illnesses. (Doc. No. 15 at 21.) Bentz further states, without explanation, that the ALJ "incorrectly state[d] the evidence" regarding her hospitalizations. (*Id.*) Bentz points to the VE's testimony in response to a question from counsel that "'an individual that has sporadic gaps in showing up is going to exceed the average of once a month and is not going to be able to retain employment,'" and asserts that "the evidence shows a prohibitive

---

[9] The ALJ gave considerable weight to the opinions of state agency psychological consultants, Drs. Kirwin and Waggoner, except for the limitation to "superficial" interaction. (Tr. 575.)

absenteeism rate of greater than once per month between October 2016 and October 2017, along with sporadic gaps in employment that resulted in her inability to retain employment." (*Id.* at 22.)

The Commissioner responds that the ALJ considered Bentz's hospitalizations in the RFC analysis, and even "assuming Plaintiff's assertion that her hospitalizations amounted to thirteen days during this time is accurate, the ALJ's finding that those hospitalizations did not require an absenteeism limitation" in the RFC was reasonable.  (Doc. No. 17 at 7.)  The Commissioner asserts Bentz's argument is "at best" an inappropriate request for the Court to reweigh the evidence.  (*Id.*)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 404.1545(a)(1).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 404.1527(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R. § 404.1527(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 404.1546(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the

adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered.  *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*).  However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

Regarding Bentz's hospitalizations and absenteeism, the ALJ found as follows:

> The undersigned has given due consideration to the claimant's hospitalizations related to her mental impairments, and when averaging the

27

days she has demonstrated she would be absent from work related to these hospitalizations, such frequency is not work-preclusive when considering the testimony of the vocational expert. The record shows two hospitalizations for suicidal ideation in 2016, one in 2017 (an overnight), another in October of 2018 for about one week, and she testified to an additional hospitalization in October of 2019. When asked regarding how sporadic absences are treated by employer, the vocational expert testified that if the absences exceed the average of one day per month, or 12 per year. The record does not demonstrate absences from mental health hospitalizations that exceed this average monthly tolerance. The undersigned has not minimized the impact the claimant's mental impairments; however, the exam findings, reported functioning, medical history of hospitalizations, and the weighted portions of the medical opinions do not warrant a greater degree of specific mental functional limitations, than those which are set forth in the above residual functional capacity assessment. The claimant was observed to benefit from medication, group sessions, and distance from familial stressors. (8F/16-17). Treating notes generally indicate good response to medications and counseling, though she has required titration of medication dosages. (6F/74-90).

(Tr. 569.)

First, the record evidence Bentz cites to regarding her hospitalizations does not support a total of 13 days in the hospital between October 2016 and July 2017.  The record evidence cited reflects a three day stay in October 2016, a three day stay in December 2016, an overnight stay in June 2017, and a three day stay in July 2017.  (*Id.* at 998, 1019, 1023-50, 1064, 969-80.)  Furthermore, Bentz fails to explain how the ALJ mischaracterized the evidence regarding her hospitalizations, and the Court shall not make such arguments for her.

Second, Bentz overlooks the VE's testimony that the ALJ credited, which is that a "person can occur an absence event ongoing no more than once a month to sustain competitive employed [sic]" and that "the no more than once a month absence event is an average, which is the best we can do."  (Tr. 622-23.)  Although Bentz relies on the VE's testimony that he thought "an individual that has sporadic gaps in showing up is going to exceed the average of once a month and not going to be able to retain employment" (Tr. 623), the ALJ specifically found that the record did not support a finding that Bentz would exceed an average of once per month in absences.  (Tr. 569.)  While Bentz interprets the evidence

28

differently or would have weighed the evidence differently, that is not for this Court to do on judicial review.

Although Bentz cites evidence from the record she believes supports a more restrictive RFC, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion."  *Buxton*, 246 F.3d 762 at 772-73.  Indeed, the Sixth Circuit has made clear that an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Date: November 2, 2021                                     *s/ Jonathan Greenberg*
                                                                     Jonathan D. Greenberg
                                                                     United States Magistrate Judge